# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
DEMANNE CUTCHIN,               )
                                   )
              Plaintiff,         )
                                   )
              v.               )      Civil Action No. 14-0206 (RBW)
                                   )
DISTRICT OF COLUMBIA, *et al.*,  )
                                   )
           Defendants.[1]    )
_____ )

## <u>MEMORANDUM OPINION</u>

Demanne Cutchin ("the plaintiff" or "Cutchin") brings this action against Metropolitan Transit Police Department ("MTPD") officers Christian Muñoz ("Muñoz") and Francisco Santiago ("Santiago") in their individual capacities. Amended Complaint ("Am. Compl.") ¶¶ 6-8.[2] Cutchin alleges that these defendants violated his rights protected by the Fourth Amendment to the United States Constitution when they falsely imprisoned him and used excessive force when they arrested him. *Id*. ¶¶ 27-28. In addition, Cutchin brings an intentional infliction of

---

[1] In its July 21, 2015 Memorandum Opinion and Order, ECF No. 19, the Court dismissed the District of Columbia as a party defendant and dismissed the Amended Complaint as to the Washington Metropolitan Area Transit Authority on March 31, 2016, *see* ECF No. 27. For administrative convenience, the case caption remains unchanged.

[2] Because the District of Columbia no longer is a party, the Court summarily dismisses Cutchin's deliberate indifference claim. *See* Am. Compl. ¶ 30. Deliberate indifference pertains to a municipality's liability for violations of constitutional rights. *See Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133 (D.D.C. 2011) (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-94 (1978)). As indicated, the District of Columbia having been dismissed as a party defendant, a deliberate indifference claim cannot proceed against Santiago and Muñoz in their individual capacities.

emotional distress claim against the two officers. *Id*. ¶ 29. He demands a declaratory judgment and compensatory and punitive damages. *Id*. (Prayer for Relief). This matter is before the Court on Defendants Santiago and Muñoz's Motion for Summary Judgment. For the reasons discussed below, the Court grants the motion.

## I. BACKGROUND

### A. The Defendants' Asserted Facts

Santiago and Muñoz were partners, Memorandum of Points and Authorities in Support of Plaintiff['s] Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n"), Exhibit ("Ex.") 1 (Trial Transcript) at 47:3-9[3], assigned to the Metro Enforcement Division, "a casual clothes unit specifically for the buses," *id.*, Ex. 1 at 43:24-44:1, to work at the Anacostia Metro Station "due to high robberies and continued [fare] evasion problems" at that location, *id*. at 45:6-7, *see also id*. at 124:25-125:13.[4] On January 29, 2013, *id*., Ex. 1 at 44:17-19, at or about 5:40 p.m., *id.*, Ex. 1 at 47:16, they "were at the 90 bus bay" because that particular route was "having issues with [fare] evasions and . . . assaults," *id*. at 47:18-20.

---

[3] The transcript was transcribed during Cutchin's criminal trial conducted in the Superior Court of the District of Columbia on November 8, 2013.

[4] The parties rely on testimony presented at Cutchin's criminal trial on November 8, 2013, to support their respective positions. The defendants attach transcript excerpts of Muñoz's and Santiago's testimony on direct examination. *See generally* Memorandum of Points and Authorities in Support of Defendants Santiago's and Muñoz'[s] Motion for Summary Judgment ("Defs.' Mem."), Ex. 1 (Excerpt of November 8, 2013 transcript) (exhibit number designated by the Court). Cutchin attaches to his amended complaint an excerpt consisting principally of Muñoz's testimony on cross-examination, *see* Am. Compl., Ex. 3 (Excerpt of November 8, 2013 transcript), and attaches to his opposition a copy of the transcript including all the testimony of the six witnesses who testified on November 8, 2013, *see generally* Pl.'s Opp'n, Ex. 1 (November 8, 2013 Trial Transcript). Citations to the trial transcript in this Memorandum Opinion are references to the plaintiff's submission, which appears to be the complete transcript of the November 8, 2013 proceedings ("Pl.'s Opp'n, Ex. 1").

Muñoz was seated in the front of the bus near the entrance door approximately three feet from the fare machine. *Id.*, Ex. 1 at 48:15-22. The bus driver had disembarked to take a break. *Id.*, Ex. 1 at 48:5-8. During such breaks, Muñoz testified that occasionally "customers who would take advantage of the situation kind of jump on the bus without paying" the fare. *Id.*, Ex. 1 at 47:23-25. If a passenger paid his fare using a SmarTrip card, the machine beeps, *id.*, Ex. 1 at 48:22-49:4, and if the payment has not "gone through," *id.*, Ex. 1 at 49:2-3, the machine makes "a real loud annoying noise" instead, *id.*, Ex. 1. at 49:5-6. A passenger who transfers from one bus to another may use a SmarTrip card, and he would have "about two hours to get onto another bus without . . . having to pay another [fare]." *Id.*, Ex. 1 at 49:9-14.

From his seat at the front of the bus, Muñoz observed two or three passengers board the bus and pay their fares. *Id.*, Ex. 1 at 50:4-22. Muñoz then observed Cutchin board the bus, *id.* at 50:23-25, with a female companion, *id.* at 51:6-9, and "kind of look[] to his left and to the right," *id.* at 51:1-2. Muñoz took this as "an indication" that Cutchin was "looking for the bus driver to see if [he was] being looked at," *id.*, Ex. 1 at 51:3-4. Muñoz testified that Cutchin "just walked to the rear of the bus." *Id.*, Ex. 1 at 51:4-5. In other words, according to Muñoz, he observed Cutchin board the bus without paying his fare. Statement of Material Facts Not In Dispute ("Defs.' Facts") ¶ 8; *see* Pl.'s Opp'n, Ex. 1 at 50:2-51:18. "At that time[,] [Muñoz] notified [his] partner who was outside to let him know [they had] one individual who didn't pay for the bus and [they] were going to take him off the bus." Pl.'s Opp'n, Ex. 1 at 15-18.

The bus driver returned about five minutes after Muñoz observed Cutchin board the bus. *Id.*, Ex. 1 at 52:9-12. Muñoz asked the driver to open the rear door of the bus, he then walked to the rear of the bus to approach Cutchin, identified himself as an MTPD officer, and displayed his badge. *Id.*, Ex. 1 at 52:22-53:3.

Muñoz and Cutchin got off the bus and they "walked . . . to the bus bay where people usually sit at to wait for the bus." *Id*., Ex. 1 at 53:12-13; *see id.*, Ex. 1 at 104:24-105:16. Muñoz then informed Cutchin that the officers stopped him because he had not paid his fare. *Id*., Ex. 1 at 53:17-18; *see* Defs.' Facts ¶ 9. Cutchin told the officers that he had paid his fare with a SmarTrip card and produced a card. Pl.'s Opp'n, Ex. 1 at 53:19-24. Santiago remained at the bus bay with Cutchin while Muñoz boarded the bus, *id*., Ex. 1at 53:25, and "rescanned the card to see if it had been processed[,]" *id*., Ex. 1 at 54:1; Defs.' Facts ¶ 10. "[I]t showed it had not been processed." Pl.'s Opp'n, Ex. 1 at 54:2.

Under such circumstances, MTPD officers ordinarily ask the individual for identification for the purpose of issuing a citation, "a ticket for not paying the fare," *id*., Ex. 1 at 55:20, which was done here, *id*., Ex. 1 at 55:14-20. When Cutchin did not produce any form of identification, Muñoz asked for his name, address, date of birth and other information. *Id*., Ex. 1 at 55:21-24, 56:21-25. Muñoz had the impression that Cutchin "wasn't being forthcoming," *id*., Ex. 1 at 56:25, and the officers decided to arrest him, *id*., Ex. 1 at 57:5-6. When Muñoz directed Cutchin to turn around, *id*., Ex. 1 at 57:5-6, Cutchin complied. Cutchin then "put his hands behind his back[,] and [Muñoz] placed the handcuffs on him and . . . sat him down on the bench" at the bus bay. *Id*., Ex. 1 at 57:24-58:1. Meanwhile, Cutchin's companion had gotten off the bus and was speaking with Santiago. *Id*., Ex. 1 at 55:4-56:17, 58:2-5.

As Muñoz was "pulling out [a contact] card, "which is a little paper card to collect a person's information if [the person does not] have a hard ID," *id*., Ex. 1 at 58:12-14, Cutchin "just got up and just ran," *id*., Ex. 1 at 58:20-21, with his hands still cuffed behind his back, *id*., Ex. 1 at 59:1; Defs.' Facts ¶ 14. Cutchin ran "as fast as he could" with the impediment of having his hands handcuffed behind his back. Pl.'s Opp'n, Ex. 1 at 101:22-23; Defs.' Facts ¶ 16.

Muñoz shouted to Santiago, "He's running." Pl.'s Opp'n, Ex. 1 at 59:15-16. Cutchin managed to run "about a bus length," *id.*, Ex. 1 at 59:3, before Santiago grabbed Cutchin's jacket, *id.*, Ex. 1 at 59:17-18; *see id.*, Ex. 1 at 101:21-25; Defs.' Facts ¶ 15. Santiago "grabbed onto [Cutchin], at which time he fell on [Cutchin]," Pl.'s Opp'n, Ex. 1 at 101:8-9, and "[a]ll he could do [was to grab Cutchin] in a tackle position and hold him on the ground" until Muñoz reached them, *id.*, Ex. 1 at 101:7-11; *see* Defs.' Facts ¶¶ 16-17. Muñoz was about two feet away when Cutchin and Santiago hit the ground. Pl.'s Opp'n, Ex. 1 at 60:1. When Muñoz reached them, because Cutchin was "still struggling on the ground," *id.*, Ex. 1 at 60:8, Santiago attempted to restrain Cutchin's legs, *id.*, Ex. 1 at 60:14-15, while Muñoz attempted to "make it towards [Cutchin's] upper torso," *id.*, Ex. 1 at 60:7.

Cutchin continued to struggle and resist. *Id.*, Ex. 1 at 60:8, 102:1-7; Defs.' Facts ¶ 17. While he remained "facing down on the sidewalk," Pl.'s Opp'n, Ex. 1 at 60:25, the officers "notice[d] that he [kept] trying to bring his arms around to the front," *id.*, Ex. 1 at 61:3-4. In the officers' experience, Cutchin's efforts "to bring his arms forward" indicated that he was "trying to reach for something." *Id.*, Ex. 1 at 61:12-14. Cutchin "just kept fighting" the officers, *id.*, Ex. 1 at 62:13-14, as Muñoz "was trying to see what he was reaching for, so [Muñoz] flip[ped] Cutchin] up," *id.*, Ex. 1 at 62:17-18. Muñoz then observed "the handle of [a] gun coming out of [Cutchin's] waistband," *id.*, Ex. 1 at 62:16-17; *see id.*, Ex. 1 at 102:4-103:6, which prompted him to "yell 'Gun, gun, gun, gun,'" and uniformed officers responded, *id.*, Ex. 1 at 62:24-25. Muñoz "grab[bed] the pistol grip on the weapon," *id.*, Ex. 1 at 63:1-2, and realized that the drawstring of Cutchin's pants was "tied around the trigger guard," *id.*, Ex. 1 at 63:4-5; *see id.*, Ex. 1 at 92:14-25. Muñoz freed the weapon and handed it to another officer. *Id.*, Ex. 1 at 103:17-18. "[T]his

struggle . . . on the ground," *id.*, Ex. 1 at 120:4, lasted only "[a] matter of seconds[,]" *id.*, Ex. 1 at 120:4.

Santiago testified that he remained outside of the bus near its rear door while Muñoz approached Cutchin. *Id.*, Ex. 1 at 127:15-21. After Cutchin had been handcuffed, Santiago observed Cutchin's female companion get off of the bus, and Santiago spoke with her while standing about five feet away from Muñoz and Cutchin. *Id.*, Ex. 1 at 128:7-17. While speaking with the companion, Santiago saw Cutchin "attempt[] to flee" by running "towards the back of the bus." *Id.*, Ex. 1 at 129:24-25, *see id.*, Ex. 1 at 129:7-10. Santiago "chased him," *id.*, Ex. 1 at 129:12, and he yelled, "Police. Stop," *id.*, Ex. 1 at 129:23, yet Cutchin kept running, *id.*, Ex. 1 at 129:24-25; *see* Defs.' Facts ¶¶ 16-17. When Santiago neared Cutchin, he "yanked" Cutchin by his jacket from behind, at which time both men fell to the ground. Pl.'s Opp'n, Ex. 1 at 129:15-17; *see* Defs.' Facts ¶ 17. Santiago hit the ground "elbow first," Pl.'s Opp'n, Ex. 1 at 130:22, with Cutchin "slightly . . . on top of [him]," *id.*, Ex. 1 at 130:21-22, and Muñoz then "was able to get ahold of [Cutchin who] continued to resist," *id.*, Ex. 1 at 130:23-24. According to Santiago, Cutchin "kept shaking," "was always moving trying to flee" and "never stood still." *Id.*, Ex. 1 at 136:22-23. He estimated that "maybe . . . five seconds" elapsed between the time Muñoz "yelled 'Gun'" and the time Muñoz "was able to pull [] the gun from . . . the front of [Cutchin's] waistband." *Id.*, Ex. 1 at 131: 1-3. The gun was "a 40 caliber semi automatic handgun," *id.*, Ex. 1 at 131:18, manufactured by Taurus, *id.*, Ex. 1 at 131:21. The handgun was loaded and later found to be operable. *See id.*, Ex. 1 at 65:6-66:11, 70:16-71:3.

Because Cutchin remained handcuffed, his "head and body hit the ground when he fell." Defs.' Facts ¶ 22. "Santiago dropped his weight into [Cutchin's] lower back as he squeezed the

handcuffs tight around [Cutchin's] wrists and raised [Cutchin's] arms toward his head." *Id.* ¶ 23. After the incident, Cutchin "was taken to United Medical Center." *Id.* ¶ 24.

Thaddeus Ferguson, a uniformed MTPD officer, Pl.'s Opp'n, Ex. 1 at 113:7-19, testified that he was on patrol on January 29, 2013, at approximately 5:40 p.m. at the Anacostia Metro Station entrance across from the bus bay, *id.*, Ex. 1. at 113:7-22, 114:1-5. While standing approximately six feet away, *id.*, Ex. 1 at 114:10-14, he observed Santiago and Muñoz chasing Cutchin, *id.*, Ex. 1 at 114:8-9, who "was running from the bus stand towards the street," *id.*, Ex. 1 at 115:6-7. Officer Ferguson searched Cutchin after the handgun had been retrieved and found in Cutchin's pocket a plastic bag containing ammunition.[5] *Id.*, Ex. 1 at 116:16-117:1.

Cutchin ultimately was found guilty by a jury in the Superior Court of the District of Columbia of carrying a pistol outside of his home or business, unlawful possession of a firearm, possession of an unregistered firearm, and unlawful possession of ammunition; the Superior Court imposed a 48-month prison term. *See* Defs.' Facts ¶ 25; Memorandum of Points and Authorities in Support of Defendants Santiago's and Muñoz's Motion for Summary Judgment ("Defs.' Mem."), Ex. 2 (Sentence of the Court, *United States v. Cutchin*, No. 2013 CF2 001496 (D.C. Super. Ct. Mar. 14, 2014)) (exhibit number designated by the Court). Cutchin appealed, and among other arguments, contended that the officers lacked probable cause to stop him. *See* Am. Compl., Ex. 1 (Excerpt from Reply Brief of the Appellant, *Cutchin v. United States*, Nos.

---

[5] MTPD Mobile Patrol Officer Colin Jackson, who also was a Crime Scene Search Officer and Field Scene Search Officer, *id.*, Ex. 1 at 139:6-13, responded to Muñoz's and Santiago's request to "process a handgun that was recovered," *id.*, Ex. 1 at 140:10. The weapon was a 40 caliber Taurus, which "had a magazine in it [and] had one round in the magazine." *Id.*, Ex. 1 at 141:3-4; *see id.*, Ex. 1 at 143:15-144:6. Officer Jackson also processed a plastic bag retrieved from Cutchin's person containing "loose ammunition." *Id.*, Ex. 1 at 146:4-5. Officer Alicia Kornegay, the Custodian of Records for the Metropolitan Police Department's Gun Registry Unit, *id.*, Ex. 1 at 108:13-19, testified that Cutchin did not have a registration certificate for the handgun and ammunition, *id.*, Ex. 1 at 111:7-15.

13-CO-1318, 14-CO-25 and 14-CF-296 (D.C. Ct. of App. Nov. 7, 2014)) at 12, 14. However, the District of Columbia Court of Appeals affirmed the convictions. *See Cutchin v. United States*, 111 A.3d 647 (D.C. 2015) (Table)).

*B. The Plaintiff's Asserted Facts*

On January 29, 2013, at approximately 3:40 p.m., Cutchin and a female friend boarded a W4 bus on Division Avenue, N.E. Am. Compl. ¶ 9.[6] Cutchin paid the bus fare using a SmarTrip card. *Id*. At approximately 5:20 p.m., Cutchin and his friend transferred to a 90 bus at the Anacostia Metro Station. *Id*. ¶ 10; "Opposition" to Defendants['] Statement of Material Facts Not In Dis[pute]; Plantiff['s] Statement of Material Facts Not In Dispute Reply" ("Pl.'s Facts") ¶ 2. He contended that he used the same SmarTrip card "to pay [his] fare, which was (FREE) before (2) hours under (WMATA) rules." Am. Compl. ¶ 10. Roughly five to ten minutes after Cutchin and his friend took seats in the back of the bus, "Hispanic men in sweathoods," later identified as Santiago and Muñoz, "[boarded] the bus through the back door and told [Cutchin] to get up and get off the bus with them." *Id*. ¶ 11; Pl.'s Facts ¶ 3.

Both Santiago and Muñoz escorted Cutchin off the bus. Am. Compl. ¶ 11; Pl.'s Facts ¶ 3. "Once off the bus," the officers "said in a mysterious way that [Cutchin] did not pay [his] fare[.]" Am. Compl. ¶ 12. They then "place[d Cutchin] in handcuffs[ and] said [he] was under arrest." *Id*.; Pl.'s Facts ¶ 12. While the officers searched Cutchin and his backpack, Am. Compl. ¶ 13; Pl.'s Facts ¶ 5, Cutchin "ask[ed] them to stop because [he] paid [his] fare [and stated] that yall [sic] is wrong," Am. Compl. ¶ 13; Pl.'s Facts ¶ 7. Cutchin either "presented" a SmarTrip

---

[6] The Amended Complaint, ECF No. 20, is a verified complaint, and serves as an "acceptable opposition to a motion under Rule 56 for summary judgment." *Neal v. Kelly*, 963 F. 2d 453, 457 (D.C. Cir. 1992).

card for the officers to examine, Pl.'s Facts ¶ 10, or Santiago removed a SmarTrip card from Cutchin's pocket, Am. Compl. ¶ 14, presumably to verify whether the card had been used to pay the fare when Cutchin boarded the 90 bus, *see id*.; Pl.'s Facts ¶ 10. Cutchin maintained that he was transferring from one bus to another and that he "touch[ed the fare] machine with [his SmarTrip] card." Pl.'s Facts ¶ 9. Santiago presumably went to see if the SmarTrip card had been used to pay Cutchin's fare, Am. Compl. ¶ 14, but when he returned, he did not state whether Cutchin paid the fare; instead, "he kept trying to search [Cutchin] and [his] backpack," *id*. ¶ 15.

After Cutchin apparently identified himself by giving the officers his name, *id*. ¶ 16; *see* Pl.'s Opp'n, Ex. 2 (Police Report), he contends that he then "stepped out into the open[] area at the metro station (street) in front of the 90 bus stop," Am. Compl. ¶ 17; Pl.'s Facts ¶ 15 ("Plaintiff step[ped] out in the open about a bus length as oppos[ed] to running a bus length claim by defendants." (emphasis removed)). It is then when, according to Cutchin, "Santiago had to be using all of his might because he slammed [Cutchin] very hard to the cement ground on [his] head," causing "the side of [his] face" to hit the ground "very hard." Am. Compl. ¶ 18; Pl.'s Facts ¶¶ 16-17.[7] Cutchin further contends that Santiago and Muñoz picked him up, only to have Santiago "slam[ him] back to the cement ground very hard again," causing Cutchin to "hit [his] head [and become] dazed[.]" Am. Compl. ¶ 20. Cutchin also represents that "Santiago then dropped his knee and body weight into [Cutchin's] lower back real hard, raised [Cutchin's]

---

[7] Cutchin also alleges he was "kicked by other officers while . . . on the ground." Am. Compl. ¶ 18; *see* Pl.'s Opp'n at 4. He does not identify which officer allegedly kicked him, indicate where or how many times he was kicked, or specify whether any particular injury is traceable to the alleged kick(s). The medical records he produced, *see* Pl.'s Opp'n, Exs. 4-5 (Exitcare® Patient Information), reflect a visit to the emergency room at Howard University Hospital on April 24, 2017. Cutchin fails to explain their connection to the events of January 29, 2013.

arms toward [his] head while squeezing the handcuffs around [his] wrist past tight and he made [Cutchin's] face drag the cement[.]" *Id.* ¶ 21.  According to Cutchin, the officers "left [him] on the cement cold ground handcuff[ed] until the ambulance came." *Id.* ¶ 22.  Cutchin contends that his head was bleeding; his wrist was swollen; and his "back felt broke." *Id.*  He was subsequently taken to the emergency room at the United Medical Center, *id.* ¶ 23, for injuries sustained during this encounter, *see id.*, Ex. 2 (Medical records and requests for treatment), particularly "an abrasion to the right side of his face," Pl.'s Opp'n, Ex. 3 (MTPD Digital Video Recording Request ("DVR Request")) (emphasis removed); *see id.*, Ex. 4 (photo of Cutchin's face).  Cutchin was then taken to the Metropolitan Police Department's Seventh District police station house for processing.  Am. Compl. ¶ 26.

Although the amended complaint does not mention the handgun and his criminal convictions related to the seizure of the a gun and ammunition from his person, Cutchin does not dispute the defendants' assertions that he has been convicted of four firearms-related offenses.  Pl.'s Facts ¶ 25.  He notes, however, that he was "never charged or convicted for fare evasion." *Id.*

## II. STANDARDS OF REVIEW

### A. *Summary Judgment*

Courts may grant summary judgment if there is "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 further provides:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . . affidavits or declarations, stipulations . . . , admissions, [or] interrogatory

answers[, or by] showing that the materials cited do not establish the
absence or presence of a genuine dispute, or that an adverse party
cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to

properly address another party's assertion of fact as required by Rule 56(c), the court may . . .

consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

A material fact is one which "might affect the outcome of the suit under the governing

law," and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). In determining whether there is a genuine dispute about material facts, the Court

must view the evidence in the light most favorable to the non-moving party and draw all

reasonable inferences in his favor. *See id.* at 255; *Grosdidier v. Broad. Bd. of Governors,

Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013). "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C.

Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010))

(internal quotation marks omitted). Therefore, courts "do not determine the truth of the matter,

but instead decide only whether there is a genuine issue for trial." *Id.* "If material facts are at

issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not

available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute does not bar summary judgment, however. *See

Anderson*, 477 U.S. at 248. The nonmoving party must show more than "[t]he mere existence of

a scintilla of evidence in support of the plaintiff's position. *Id.* at 252. Rather, " there must be

evidence on which the jury could reasonably find" in his favor. *Id.* Unsupported allegations or

conclusory statements are not sufficient to defeat summary judgment. *See Ass'n of Flight Attendants - CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

*B. Qualified Immunity*

Where, as in this case, a plaintiff brings a claim under 42 U.S.C. § 1983 (2012), the defendants may raise an affirmative defense of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818 (citations omitted). Such "immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and when it is "properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This protection is afforded to police officers regardless of whether their "error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (citations and internal quotation marks omitted); *see also Brinegar v. United States*, 338 U.S. 160, 176 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.").

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-step analysis for resolving qualified immunity claims by government officials. First, the Court decides "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* at 201. If the plaintiff satisfies this first step, the Court then decides whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* The sequence of this analysis is not mandatory, however, and the Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. "[W]hether a § 1983 defendant's conduct violates the 'clearly established' constitutional rights of the plaintiff is a pure question of law that must be resolved by the [C]ourt." *Pitt v. District of Columbia*, 491 F.3d 494, 509 (D.C. Cir. 2007).

Once a defendant asserts a qualified immunity defense, the plaintiff's burden of proof is "to show that the official is not entitled to qualified immunity." *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 388 (D.D.C. 2016) (citations omitted), *appeal dismissed sub nom. Kyle v. Davis*, No. 16-7040, 2016 WL 6915562 (D.C. Cir. Oct. 26, 2016). He "must show not only that an official violated a constitutional right but also that the right was clearly established at the time of the violation." *Fenwick v. Pudimott*, 778 F.3d 133, 137 (D.C. Cir. 2015) (internal quotation marks and citation omitted). "To decide the issue of whether or not the non-movant may survive summary judgment – *i.e.*, whether he has provided enough evidence that a reasonable jury could return a verdict in his favor – the court must first identify the version of events that best comports with the summary judgment standard and then ask whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Kyle*, 177 F. Supp. 3d at 389 (internal quotation marks and citations omitted).

Where, as here, the question of qualified immunity is presented on summary judgment and where the parties' versions of events differ, the Court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing" the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks and citations omitted); *see Tolan v. Cotton*, 572 U.S. 650, 657, 134 S. Ct. 1861, 1866 (2014) (per curiam) (finding that the Fifth Circuit "failed to view the evidence at summary judgment in the light most favorable to [the plaintiff]" by improperly weighing the evidence and resolving disputed issues in the moving party's favor); *Pitt v. District of Columbia*, 558 F. Supp. 2d 11, 16 (D.D.C. 2008) ("In assessing whether a party is entitled to qualified immunity, the facts must be taken in the light most favorable to the party asserting the constitutional injury."). "[T]his usually means adopting . . . the plaintiff's version of the facts," *Scott*, 550 U.S. at 378, and "[q]ualified immunity cannot be granted on summary judgment . . . if there is a genuine issue as to a material issue of fact," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).

## III. DISCUSSION

### A. Cutchin's False Imprisonment Claim

"There appears to be no real difference as a practical matter between false arrest and false imprisonment," *Shaw v. May Dep't Stores Co.*, 268 A.2d 607, 609 n.2 (D.C. 1970) (citations omitted), and "[t]he elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim," *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996) (citation omitted); *see Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 989 (D.C. Cir. 2014) ("Constitutional and common law claims of false arrest are generally analyzed as though they comprise a single cause of action." (citations omitted)). "In actions for false arrest and false imprisonment, the central issue is whether the arresting officer was justified in

ordering the arrest of the plaintiff[.]"  *Scott v. District of Columbia*, 493 A.2d 319, 321 (D.C.

1985) (internal quotation marks and citation omitted).

The defendants move for summary judgment on Cutchin's false imprisonment claim on

two grounds.  First, they argue that Cutchin's false imprisonment claim amounts to an

impermissible collateral attack on his criminal convictions.  *See* Defs.' Mem. at 4-5.  The

Supreme Court instructs that:

> in order to recover damages for allegedly unconstitutional
> conviction or imprisonment, or for other harm caused by actions
> whose unlawfulness *would render a conviction or sentence invalid*
> a plaintiff must prove that the conviction or sentence has been
> reversed on direct appeal, expunged by executive order, declared
> invalid by a state tribunal authorized to make such determination, or
> called into question by a federal court's issuance of a writ of habeas
> corpus.

*Heck v. Humphrey*, 512 U.S. 477, 486-487 (1994) (emphasis added).  The defendants

demonstrate, and Cutchin fails to rebut, that Cutchin was convicted of four criminal offenses

arising from the January 29, 2013 encounter, that he raised the issue of probable cause on appeal,

and that the District of Columbia Court of Appeals affirmed his convictions nonetheless.  *See*

Defs.' Facts ¶¶ 25-28.  If this Court were to decide that Cutchin's detention and arrest were

unlawful, its ruling necessarily would amount to a challenge to the legality of Cutchin's criminal

conviction, which this Court cannot do.  Therefore, under *Heck*, Cutchin cannot recover damages

for an arrest the District of Columbia courts have found to be lawful.

In the alternative, the defendants move for summary judgment on the ground that

probable cause for Cutchin's arrest existed, and therefore, Santiago and Muñoz are protected by

qualified immunity.  *See* Defs.' Mem. at 3-4.

A police officer accused of false arrest "may defend on the merits by proof . . . that the arrest was made in good faith, with probable cause, under a statute he reasonably believed to be valid." *Wade v. District of Columbia*, 310 A.2d 857, 862 (D.C. 1973) (citing *Pierson v. Ray*, 386 U.S. 547 (1967)); *see District of Columbia v. Wesby*, __ U.S. __, __, 138 S. Ct. 577, 586 (2018) ("A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." (citation omitted)). "To determine whether an officer had probable cause for an arrest," courts must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Wesby*, __ U.S. at __, 138 S. Ct. at 586 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)) (additional citation omitted). "The issue of probable cause in a false arrest case is a mixed question of law and fact that the trial court should ordinarily leave to the jury," and "[o]nly where the facts are undisputed or clearly established does probable cause become a question of law for the court." *Amobi*, 755 F.3d at 990 (citations omitted).

Cutchin first responds by asserting his innocence of the offense of fare evasion. According to Cutchin, he could not have committed fare evasion because there is "no statutory provision identified" as fare evasion. Am. Compl. ¶ 27. He is mistaken. Fare evasion is unlawful in the District of Columbia pursuant to the District of Columbia Code which provides that:

> No person shall either knowingly board a public or private passenger vehicle for hire, including vehicles owned and/or operated by the Washington Metropolitan Area Transit Authority, which is transporting passengers within the corporate limits of the District of Columbia; or knowingly board a rail transit car owned and/or operated by the Washington Metropolitan Area Transit Authority which is transporting passengers within the corporate limits of the

> District of Columbia; or knowingly enter or leave the paid area of a rail transit station owned and/or operated by the Washington Metropolitan Area Transit Authority which is located within the corporate limits of the District of Columbia without paying the established fare or presenting a valid transfer for transportation on such public passenger vehicle or rail transit car.

D.C. Code § 35-216 (2001).

Cutchin also notes that he was not charged with or cited for fare evasion. Pl.'s Facts ¶ 25. It is his "understand[ing] that 'fare eva[sion]' is typically prosecuted by the government [as] a theft [offense] . . . covering the receipt of services without intending to pay the required fee." Am. Compl. ¶ 27. Referencing the brief submitted on his behalf to the District of Columbia Court of Appeals, Cutchin appears to argue that he could not have committed a theft offense, which requires specific intent, because the 90 bus was stationary when he boarded, and he could not have committed "theft until the bus began operating." *Id.*, Ex. 1 (Excerpt from Reply Brief of the Appellant) at 12. And, Cutchin further argues that he was not required to pay a fare to board the 90 bus because he boarded during the two-hour period within which a passenger may transfer from one bus to another without paying an additional fare. *See* Pl.'s Opp'n at 5. Essentially, Cutchin argues that because he could not have committed theft, Santiago and Muñoz lacked probable cause to arrest him for fare evasion. His arguments fail.

Whether Cutchin ultimately was charged with or convicted of fare evasion is not germane to the question of the officers' had probable cause to believe that he committed a crime in their presence. The defendants' factual proffer supports their position that Muñoz observed Cutchin board the bus without paying his fare. Based on his observation, Muñoz had a reasonable basis for believing there was probable cause to arrest Cutchin for fare evasion, and he so informed Santiago. *See Dant v. District of Columbia*, 829 F.2d 69, 76 (D.C. Cir. 1987) (affirming

dismissal of the plaintiff's false arrest and imprisonment claim against the District of Columbia where arresting officer had probable cause to arrest: he observed the plaintiff insert a farecard into an exit faregate, pass through the faregate when it opened for the passenger exiting ahead of the plaintiff, disregard a lighted faregate message flashing "Stop, See Attendant," retrieve his farecard from the faregate, and walk away); *Laster v. Burks*, No. 1:04-CV-2282-CC, 2006 WL 8431549, at *4 (N.D. Ga. Jan. 31, 2006) (concluding that Metropolitan Atlanta Rapid Transit Authority Police officer who "observed the Plaintiff lingering around the entrance of the station for many minutes" and "enter the station without paying a fare . . . though the handicap gate . . . would have reason to believe that the person was trying to ride MARTA for free," and thus was entitled to qualified immunity on the plaintiff's false arrest and false imprisonment claims); *Mazurkiewicz v. New York City Transit Auth.*, 810 F. Supp. 563, 568 (S.D.N.Y. 1993) (concluding that New York City Transit Police officers who observed the plaintiff step over a turnstile without paying his fare with a token had probable cause to arrest him for theft of services).

Muñoz necessarily came to this belief before either officer approached Cutchin and before either officer escorted Cutchin off the bus. When Muñoz rescanned Cutchin's SmarTrip card, it showed that the card "had not been processed," Pl.'s Opp'n, Ex. 1 at 54:2, which bolstered his suspicion that Cutchin did not pay a fare when he boarded the 90 bus. Cutchin's assertion that Muñoz "never saw [him] board the metrobus without paying his fare," Pl.'s Facts ¶ 8, is not supported by the record, and his claim that he paid his fare for the 90 bus with a SmarTrip card, Am. Compl. ¶ 10, does not rebut Muñoz's own observation that Cutchin "just walked to the rear of the bus," Pl.'s Opp'n, Ex. 1 at 51:4-5, without paying his fare, *see id*., Ex. 1

at 51:15-18.[8]  Muñoz could not be expected to have known when he observed Cutchin board the bus whether Cutchin was transferring from one bus to another during the two-hour window when a passenger may board a second bus without paying an additional fare.

Next, Cutchin focuses on the identity of the officer or officers who escorted him off the bus.  He points to a copy of the digital video recording request Muñoz submitted to MTPD on or about January 31, 2013, *see* Pl.'s Opp'n, Ex. 3 (DVR Request), specifically the narrative portion which states:

> A1 [Cutchin] WAS ESCORTED OFF THE BUS BY MTPD #533 [Santiago] AND PLACED UNDER ARREST BY MTPD #443 [Muñoz.]

*Id.*, Ex. 3 (DVR Request).  Because the DVR Request indicates that Santiago escorted Cutchin off the bus, Cutchin appears to argue that Muñoz was never on the bus, Pl.'s Facts ¶ 8, and therefore could not have observed Cutchin board the bus without paying a fare.  The Court does not agree.  Whether Santiago, or Muñoz, or both, escorted Cutchin off the bus, Cutchin's reliance on the portion of the DVR Request indicating the Santiago escorted him off the bus does not rebut the officers' representation that Muñoz had previously been aboard the bus and was in a position to observe Cutchin when he boarded.  Cutchin ignores, and apparently expects the Court to disregard, the preceding sentence of the DVR Request which states:

> R/O [Muñoz] REPORTS WHILE ON A CASUAL CLOTHES ASSIGNMENT ON 01292013 AT APROX 1740HRS AT THE 90 BUS STAND AT THE ANACOSTIA METRO STATION OBSERVING A1 BOARD THE BUS MAKING NO ATTEMPT TO PAY THE ESTABLISHED FARE

---

[8]  Furthermore, Cutchin's assertion as to what Muñoz observed is not admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B); Fed. R. Evid. 602.  And Cutchin cannot rely on exhibits to which he refers, *see* Pl.'s Facts ¶¶ 9-10, that were not made part of the record in this case.

Pl.'s Opp'n, Ex. 3 (DVR Request). Thus, the DVR Request itself undermines Cutchin's position.

In any event, an officer is not obligated to "rule out" the validity of a suspect's claims of innocence prior to arresting him. *See Wesby*, __ U.S. at __, 138 S. Ct. at 588 (noting that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts"); *Amobi*, 755 F.3d at 990 (rejecting argument that the plaintiff's "claim of innocence created a genuine issue of material fact that should have been sent to the jury"); *Williams v. District of Columbia*, 268 F. Supp. 3d 178, 187 (D.D.C. 2017) (concluding that police officers who had probable cause to believe the plaintiff had committed assault were not required by the Fourth Amendment to interview him to investigate his possible innocence before making the arrest).

Next, Cutchin urges the Court to reject Muñoz's "perjured and impeached statements" in considering the defendants' summary judgment motion. *See* Pl.'s Opp'n at 2. As the basis for his attack on Muñoz's credibility, Cutchin relies on the allegedly conflicting or inconsistent information Muñoz provided at various times prior to and during Cutchin's criminal trial. For example, Cutchin notes that Muñoz testified at a probable cause hearing that Cutchin did not necessarily have to pay a fare when he boarded the 90 bus, *see id*. at 5, while at trial Muñoz testified that Cutchin boarded the bus without paying a fare, *id*., Ex. 1 at 50:23-51:17. Cutchin also identifies a purported conflict as to which officer or officers approached him on the bus and which officer or officers escorted him off the bus. *See id*. at 6. According to Muñoz's DVR Request, Santiago escorted Cutchin off the bus, *id*., Ex. 3 (DVR Request), and at trial Muñoz testified that he escorted Cutchin off the bus, *see id*., Ex. 1 at 52:24-53:13. In a third example, Cutchin notes inconsistencies as to which officer removed a handgun from his person: before a

grand jury, Cutchin asserts, Muñoz testified that both he and Santiago retrieved the gun, *id.* at 6, at a motion hearing, Muñoz testified that uniformed officers retrieved the gun, *id.*, and at trial, Muñoz testified that he retrieved the gun, *id.*, Ex. 1 at 62:12-63:5. The discrepancies Cutchin identifies may be disputed issues of fact, but these facts are not material to the qualified immunity question, because retrieval of the gun, by whichever officer, occurred after Muñoz had developed a reasonable belief that Cutchin did not pay his bus fare and after Cutchin's arrest.

Lastly, Cutchin references other matters which allegedly occurred during or after his arrest, namely, failing to read Cutchin his *Miranda* warnings, *see id.* at 2, conducting an investigation after he was handcuffed, *see id.* at 10, and tampering with SmarTrip card records, *see id.* at 11. None of these matters is probative of the officers' perceptions leading to and ending with the decision to arrest Cutchin. Rather, these matters pertain to the underlying criminal case, the merits of which have been resolved by the District of Columbia Court of Appeals, and are not properly reviewed by this Court in this civil case.

The defendants have demonstrated, and Cutchin has not disputed, that Muñoz observed Cutchin board the bus, and take a seat without paying his fare. A reasonable officer in the defendants' position would not have known whether Cutchin had transferred from another bus (after having paid the fare) to the 90 bus at the Anacostia Metro Station within the two-hour period when a transfer would not require payment of an additional fare. Rather, on these facts, the Court agrees that Muñoz and Santiago have demonstrated that they reasonably believed that they had probable cause to arrest Cutchin. *See Tillman v. Wash. Metro. Area Transp. Auth.*, 695 A.2d 94, 96 (D.C. 1997) (affirming grant of directed verdict in police officers' favor on false arrest claim where, "although [the plaintiff's] failure to pay the fare may have been an inadvertent product of his confusion concerning the absence of the usual gate, the officers

nonetheless had probable cause to arrest him for failing to pay the required fare"); *Stebbins v. Wash. Metro. Area Transit Auth.*, 495 A.2d 741, 743 (D.C. 1985) (per curiam) (officer's testimony that he observed the plaintiff board the bus through the rear door and seat himself without making an effort to pay his fare "would indicate that [the officer] had a 'good faith, reasonable belief' that [the plaintiff] had failed to pay his fare, and that there was a valid reason to arrest and detain him.").[9]  Summary judgment is therefore granted to Santiago and Muñoz on Cutchin's false imprisonment claim.

*B. Cutchin's Excessive Force Claim*

"[C]laims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 394 (1989); *see also Hall v. District of Columbia*, 867 F.3d 138, 157 (D.C. Cir. 2017).  This is an objective standard, *Graham*, 490 U.S. at 397, and courts consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)) (internal quotation marks omitted).  "When an officer carries out a seizure that is reasonable, taking into account all

---

[9]  In addition, Santiago and Muñoz note that Cutchin argued on direct appeal of his criminal convictions that Santiago and Muñoz lacked probable cause for the arrest.  Defs.' Mem. at 4. However, the District of Columbia Court of Appeals affirmed his convictions.  *See id.*; Defs.' Facts ¶ 25.

relevant circumstances, there is no valid excessive force claim." *Cty. of Los Angeles v. Mendez*, __ U.S. __, __, 137 S. Ct. 1539, 1547 (2017).

A police officer may use a reasonable amount of force to effect an arrest. *See Graham*, 490 U.S. at 396; *Arrington*, 473 F.3d at 335-36 (citing *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993)). And, the "officer must have some justification for the quantum of force he uses." *Johnson v. District of Columbia*, 528 F.3d 969, 977 (D.C. Cir. 2008). For example, absent any indication that a suspect poses a threat to the officers or has committed a serious crime, the use of force may not be warranted. *See Hall*, 867 F.3d at 157; *DeGraff v. District of Columbia*, 120 F.3d 298, 302 (D.C. Cir. 1997). Thus, "[t]he use of force on a suspect who has already been subdued is plainly excessive." *Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124, 141 (D.D.C. 2017), *appeal dismissed*, No. 17-7074, 2017 WL 5157752 (D.C. Cir. Oct. 31, 2017); *see Johnson*, 528 F.3d at 974 (concluding that a "reasonable officer would not have repeatedly kicked [a] surrendering suspect in the groin"). Cutchin can prevail only if, "viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to [him], a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993) (citing *Martin v. Malhoyt*, 830 F.2d 237, 253 (D.C. Cir. 1987)).

The record reflects that Cutchin was cooperative when told to disembark from the bus by the officer, advised that he was under arrest, handcuffed, and seated on a bench in the bus bay. At this point, a seizure undoubtedly had occurred, *see Henson v. United States*, 55 A.3d 859, 870 (D.C. 2012) ("hold[ing] that an individual is seized within the meaning of the Fourth Amendment only when he or she is within the officer's control or yields to the officer's show of

authority or application of force"), before any use of force was employed. Whether Cutchin "stepped out into the open[]" as he contends, Am. Compl. ¶ 17, or "got up and ran" as Muñoz contends, Pl.'s Opp'n, Ex. 1 at 58:20-21, it is undisputed that Cutchin, through his own volition, moved approximately the length of a bus after he had been handcuffed, Pl.'s Facts ¶¶ 14-15; Pl.'s Opp'n, Ex. 1 at 59:2-3. Regardless of how fast Cutchin may have been moving after being detained, a reasonable officer in the defendants' position could reasonably construe his movement as an attempt to flee. And, on this issue, Cutchin's own exhibits work against him, as they tend to support the proposition that Cutchin ran. *See, e.g.*, Pl.'s Opp'n, Ex. 1 at 128:24-130:7 (Santiago's testimony); *id.*, Ex. 2 (Police Report) (stating that Cutchin "fled on foot" and that Santiago "gave chase"); *id.*, Ex. 3 (DVR Request) (stating that Cutchin "attempted to flee").[10]

Cutchin's volitional movement after his detention – which the defendants could reasonably construe as an attempt to flee – changed the dynamics of the situation. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97. While Cutchin's earlier cooperation did not call for the use of force, once he moved from the location of his initial detention, Santiago and Muñoz were "entitled to use reasonable force to prevent [him] from escaping." *Scott*, 101 F.3d at 759. Stopping Cutchin,

---

[10] Interestingly, Cutchin's original complaint alleges that he "step[ped] out into the open an[d] he gave chase. Santiago caught [Cutchin]." Compl. at 6 (page number designated by ECF).

whether by "body slamming" him, Pl.'s Facts ¶ 16, or tackling or grabbing him from behind, *see, e.g.*, Pl.'s Opp'n, Ex. 1 at 101:22-25, 129:16, under the circumstances of this case was reasonable, *see United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (concluding that tackling suspect "in full flight from officers who were justified in stopping him . . . was a reasonable method of effectuating the stop").

The situation's dynamics changed yet again when Cutchin continued to struggle after being caught and after Muñoz observed the handgun in his waistband. Neither Cutchin's Amended Complaint nor his opposition to the defendants' motion for summary judgment assert facts as to what occurred between when the defendants placed him in handcuffs and when the defendants exercised force. *See generally* Am. Compl. ¶¶ 12-22; Pl.'s Facts ¶¶ 15-17, 19. Cutchin maintains that he hit his head after being taken to the ground, Am. Compl. ¶ 20, and was dazed, *id.*, but does not assert that he did not resist or otherwise submitted to the officers' authority. Moreover, Cutchin's assertion that Muñoz "never saw a weapon on [him,]" Pl.'s Facts ¶ 20, proves nothing, as Cutchin himself cannot state what Muñoz did or did not see. And the fact that "Santiago stated he never saw Muñoz take a weapon off of [Cutchin] or he never saw [Cutchin] with a weapon," *id.* ¶ 21, does not create a genuine issue of material fact either because Santiago's failure to observe these events is not proof that the events did not occur.

Once again, Cutchin's own exhibits undercut the sustainability of his case. These exhibits include all the testimony Muñoz and Santiago presented at his criminal trial, as well as a police report and DVR Request, which describe Cutchin's continued struggle and attempts to reach for something from the front of his body, such as the waistband of his pants, despite being handcuffed and the defendants' attempts to restrain him. Cutchin's Exhibit 7, *see* Pl.'s Opp'n, Ex. 7, is also unhelpful. This exhibit appears to be a chart summarizing purported discrepancies

in information provided by Muñoz in a police report, at a preliminary hearing, before a grand jury, at a motion hearing, and at trial concerning whether either Muñoz took the gun from Cutchin, or "we," presumably meaning Muñoz and at least one other officer on the scene, took the gun from Cutchin, or whether uniformed officers seized the gun. *See id.*, Ex. 7 (Items 1, 4-7). In any event, Cutchin does not dispute that *an* officer – whether Muñoz, Santiago or a uniformed MTPD officer – retrieved the handgun, and there is no dispute that Cutchin has been convicted of firearms-related offenses arising from this incident.

Within seconds, what began as the arrest of a cooperative suspect for a minor offense turned into much more: a fleeing suspect who disobeyed the officers' commands, continued to struggle even after being taken to the ground, and who was trying to move his hands to a part of his body where a handgun was observed by Muñoz. Based on these events, the officers were entitled to respond in the manner which they did. *See Campbell v. District of Columbia*, 245 F. Supp. 3d 78, 89 (D.D.C. 2017); *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 88 (D.D.C. 2015) ("[E]ven if the officers had no knowledge of the specific criminal activity the plaintiff may [have] been involved in, the officers had a reasonable basis for suspicion sufficient to conduct an investigative stop and, as that encounter escalated, the officers used reasonable and escalating force to stop the plaintiff from both fleeing and resisting the officers' efforts to secure the situation.").

Nothing in the record suggests that the defendants or any other officer intended to cause Cutchin physical injury, and Cutchin merely alleges, but does identify anything in the record to support the proposition that, any officer gratuitously harmed him while he was handcuffed or after he was taken to the ground following his attempt to escape. He does not paint a picture of a suspect who exhibited signs of submission, only to have the officers gratuitously inflict kicks,

punches, or any other means of excessive force. *See, e.g., Johnson*, 528 F.3d at 974 (finding that repeated kicks to the plaintiff's groin while the plaintiff "acted in a submissive fashion" by falling to the floor and lying face down with arms and legs spread was not reasonable); *Wood v. District of Columbia*, No. 14-2066, 2017 WL 2374346, at *9 (D.D.C. May 31, 2017) (denying summary judgment where genuine issue of material fact existed as to whether any of five police officers "punched, kicked, or stepped on [the plaintiff] after he had been completely handcuffed and had fully submitted to their authority").

Here, the defendants are entitled to qualified immunity unless Cutchin shows the violation of a constitutional right *and* that the right was clearly established at the time of the alleged violation. *See Saucier*, 533 U.S. at 201. "Even if there is a genuine dispute about the reasonableness of an officer's use of force, he is protected by qualified immunity unless his force violated clearly established law." *Hedgpeth v. Rahim*, 893 F.3d 802, 809 (D.C. Cir. 2018) (citations omitted). The Court is satisfied that the law in this Circuit supports the conclusion that Santiago's and Muñoz's actions – pursuing and stopping an arrestee who appeared to be attempting to flee, pinning him to the ground using Santiago's body weight after he was caught, squeezing the handcuffs tighter and lifting his arms over his head – may have been painful or uncomfortable, but not unlawful. *See Cromartie v. District of Columbia*, 479 F. App'x 355, 357 (D.C. Cir. 2012) (per curiam) (slamming the plaintiff to the ground, handcuffing him, and forcibly keeping him on the ground presented "no more than the ordinary 'degree of physical coercion' used by police officers to effectuate an arrest"); *Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011) (pulling the plaintiff's arm behind her back and pushing her against a stone column in course of arrest was not excessive); *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009) (applying force to the plaintiff's arm "to secure his compliance during arrest" was not

excessive); *Scott*, 101 F.3d at 759 (concluding that striking suspect once, knocking him to the ground, rolling him over and pinning the plaintiff with their knees in order to place handcuffs on him was not excessive); *Goolsby v. District of Columbia*, 317 F. Supp. 3d 582, 594-95 (D.D.C 2018) (finding that violently slamming the plaintiff to the ground and twisting his arms in order to handcuff him was constitutionally reasonable).

The record before the Court supports the conclusion that Santiago and Muñoz had probable cause to arrest Cutchin, and that their use of force was reasonable under the circumstances that confronted them in this case. Moreover, even if Cutchin demonstrated that the officers' actions were unreasonable, he has failed to show that the existing law as developed when the events in this case occurred was so clear that only a "plainly incompetent" officer or an officer knowingly violating the law would have taken the actions challenged by Cutchin. *See Kyle*, 177 F. Supp. 3d at 393. Therefore, summary judgment is granted to Santiago and Muñoz on Cutchin's excessive force claim.

## C. Cutchin's Intentional Infliction of Emotional Distress Claim

Cutchin alleges that the Santiago and Muñoz acted in an extreme and outrageous manner, causing him to suffer severe emotional distress. *See* Am. Compl. ¶ 29. "To establish a prima facie case of intentional infliction of emotional distress ('IIED'), a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002) (citations omitted). "Liability will be imposed only for conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (internal quotation marks and citations

omitted).  The plaintiff's IIED claim fails to satisfy these requirements.

Having already found that Santiago and Muñoz had probable cause to arrest Cutchin, his IIED claim fails as a matter of law.  *See Cromartie*, 479 F. App'x at 357.  Where, as here, the officers had probable cause to arrest Cutchin, "the arrest itself cannot form the basis for a claim of extreme or outrageous conduct."  *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007); *see Smith v. United States*, 843 F.3d 509, 513 (D.C. Cir. 2016) (finding that "[t]he existence of probable cause foreclosed not only [the plaintiff's] false arrest, malicious prosecution and Fourth Amendment claims, but also his claim of intentional infliction of emotional distress based on his arrest.").  And because the officers used a reasonable amount of force in effecting Cutchin's arrest and subduing him after he attempted to escape, their conduct was not so extreme or outrageous as to merit liability on Cutchin's IIED claim.  *See Campbell*, 245 F. Supp. 3d at 89.

## III. CONCLUSION

For all of the reasons set forth above, the Court concludes that qualified immunity protects Santiago and Muñoz from liability on Cutchin's false imprisonment and excessive force claims, and Cutchin's IIED claim therefore fails as a matter of law.  Accordingly, the defendants' motion for summary judgment is granted to both officers on all of Cutchin's claims.  An Order is issued separately.


DATE: March 27, 2019                    /s/
                                        REGGIE B. WALTON
                                        United States District Judge